Andrew V. Collins (11544)
Kade N. Olsen (17775)
Parr Brown Gee & Loveless, P.C.
101 South 200 East, Suite 700
Salt Lake City, Utah 84111
Telephone: (801) 532-7840
acollins@parrbrown.com
kolsen@parrbrown.com

Alexander A. Salinas (*pro hac vice* forthcoming)
Alexander G. Plansky (*pro hac vice* forthcoming)
TA PLLC
1001 Brickell Bay Drive, Suite 1812
Miami, Florida 33131
Telephone: (305) 400-7995
asalinas@tapllc.com

*Attorneys for Aviation Consulting Corp., Aleksandr Buzin, and Konstantin Svirin*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

AVIATION CONSULTING CORPORATION, a Marshall Islands Company, ALEKSANDR BUZIN an individual, and KONSTANTIN SVIRIN, an individual,

Plaintiffs,

v.

ABELIA LIMITED, a Bermuda Company, and ANDREY SHARKOV, an individual,

Defendants.

**COMPLAINT**

**JURY DEMANDED**

Civil No. 2:26-cv-129

## COMPLAINT

Plaintiff Aviation Consulting Corp., a Marshall Islands Company ("**ACC**"), Aleksandr Buzin, individually ("**Buzin**,") and Konstantin Svirin, individually ("**Svirin**" and collectively with Buzin and ACC, "**Plaintiffs**"), hereby file this Complaint (the "**Complaint**") against Defendants Abelia Limited, a Bermuda Company ("**Abelia**"), and Andrey Sharkov, individually ("**Sharkov**," and, collectively with Abelia, "**Defendants**").

## NATURE OF ACTION

1. This case arises from billionaire Andrey Sharkov's brazen attempt to leverage his superior financial resources and foreign government connections to bully and extort Plaintiffs into surrendering their rights in an Aircraft[1] purchased by ACC.

2. Although ACC acquired the Aircraft through a carefully structured transaction that Mr. Sharkov not only knew about and approved, but actively facilitated, Mr. Sharkov subsequently decided that the Aircraft retroactively belonged to him.

3. Having unilaterally determined that he was entitled to the Aircraft, Sharkov weaponized his superior financial resources to launch a multi-jurisdictional litigation campaign designed to bully ACC into surrendering the Aircraft in exchange for nothing.

4. Not content to let the legal process play out, Sharkov has recently escalated the dispute, devising a scheme to appropriate the Aircraft, destroy Plaintiffs' professional reputations, inflict severe financial harm, and to harass and humiliate Buzin personally.

5. Towards this end, upon information and belief, Defendants have orchestrated an international smear campaign against Plaintiffs, publicizing numerous defamatory articles

---

[1] The referenced aircraft is an Embraer Legacy 650E aircraft with Manufacturer's serial number 14501239 (the "**Aircraft**").

baselessly branding Plaintiffs as fraudsters and criminals, and even made a deal with Kyrgyz officials to manufacture a bogus warrant for Buzin and. Svirin to have them arrested.

6. The purpose of Defendants' bullying and harassment is clear: compel Defendants to abandon their legitimate interests in the Aircraft through any means possible.

7. Plaintiffs bring this action to stop the attempted shakedown, and to hold Sharkov and Abelia to account for their illegal pressure campaign.

**PARTIES**

8. Plaintiff Aviation Consulting Corporation is a company organized under the laws of the Marshall Islands, with its principal office in Estonia.

9. Plaintiff Aleksandr Buzin is the CEO of ACC and a citizen of Estonia, who resides in said country.

10. Plaintiff Konstantin Svirin is the CFO of ACC and a resident of Spain.

11. Defendant Abelia Limited is a company organized and existing under the laws of Bermuda, with its principal place of business located in Hamilton, Bermuda.

12. Defendant Andrey Sharkov is a citizen of Kyrgyzstan, Malta and St. Kitts and Nevis, who resides in Monaco. Until March 2024, Sharkov was a resident of the Russian Federation.

13. Sharkov is the principal and owner of Abelia.

**JURISDICTION, AND VENUE**

14. This Court has original subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this cause of action arises under the laws of the United States, and pursuant to 28 U.S.C. § 1367 because the remaining claims are so related to the claims in this action over which the Court has original jurisdiction such that they form part of the same case of controversy.

15. This Court has personal jurisdiction over Sharkov under the Utah Long-Arm Statute because he caused a tortious injury to Plaintiffs in this state, because Sharkov's conduct was directed at Utah as the official proceeding that Sharkov intended to affect is in the District of Utah, and its defamatory articles were accessible to Utah residents.

16. This Court has personal jurisdiction over Abelia under the Utah Long-Arm Statute because it caused a tortious injury to Plaintiffs in this state, because its conduct was directed at Utah as the official proceeding that it intended to affect is in the District of Utah, and its defamatory articles were accessible to Utah residents.

17. Venue is proper in this Court under 28 U.S.C. § 1391 as a substantial part of the events or omissions giving rise to the claims occurred in this District and because the defendants are subject to personal jurisdiction in this District.

## BACKGROUND FACTS

### ACC Purchases The Aircraft

18. Andrey Sharkov, the principal of Abelia, is a wealthy businessman of Russian origin.

19. For a period of approximately eight years, ACC offered aircraft management and operational services to Sharkov (individually and through entities owned or controlled by him, including Abelia).

20. In early 2024, Sharkov reached out to ACC for help in locating a suitable aircraft for the personal and commercial needs of Vasily Anisimov ("**Anisimov**"), the principal and owner of a Liechtenstein entity called Domeltino Foundation ("**Domeltino**"), and a friend of Sharkov.

21. In or about February 2024, ACC's CEO Aleksandr Buzin ("**Buzin**"), Sharkov, and Anisimov held a conference call to discuss the potential acquisition of an aircraft, the anticipated structure of the transaction, and ACC's involvement in the same.

22. The seller of the Aircraft—DMD Aviation, LLC ("**DMD**")—did not want to export the Aircraft (that was registered in the United States), which would trigger a host of regulatory compliance paperwork.

23. To avoid this issue and to consummate the sale, Anisimov, ACC, Sharkov, and Sharkov's attorney Denis Korolev ("**Korolev**") agreed upon a back-to-back sale agreement, with two contemplated transactions.

24. First, ACC (through TVPX[2] acting as Trustee) would purchase the Aircraft directly from DMD Aviation, LLC, with Domeltino (owned by Anisimov) providing the financing for the same (the "**First Transaction**.").

25. Second, ACC would turn around and convey its title to the Aircraft to Tayyare, Limited ("**Tayyare**"), in exchange for compensation of five percent of the purchase price of the Aircraft (approximately $1,005,000), reimbursement of its costs, and a back lease of the Aircraft for commercial operations (the "**Second Transaction**").

26. This First Transaction took place as scheduled, with ACC (through TVPX acting as Trustee),[3] acquiring title to the Aircraft from DMD via an aircraft purchase agreement ("**Aircraft Purchase Agreement**"). *See* Ex. A.

27. Both Abelia and Sharkov were well aware of, and acknowledged, the First Transaction and the contents of the Purchase Agreement.

---

[2] TVPX Aircraft Solutions, Inc., as Trustee of Utah business trust TVPX 2024-13461 Business Trust ("**TVPX**").

[3] In March 2024, ACC also entered into a Trust Agreement that formed the TVPX 2024-13461 Business Trust, organized under Utah Law (the "**Utah Business Trust**"), with TVPX Aircraft Solutions, Inc., a Utah corporation, acting as trustee (the "**Utah Trustee**"). *See* Trust Agreement, Ex. B.

28. While Abelia and Sharkov now pretend to know nothing about the First Transaction, and baselessly accuse ACC of acquiring title by fraud, this revisionist history is belied by the contemporaneous evidence.

29. Tayyare was not able to complete the Second Transaction, possibly due to unanticipated tax consequences for Tayyare if it went through the Second Transaction.

30. While ACC was willing and able to proceed with the Second Transaction, Tayyare was not.

**ACC Attempts To Salvage The Second Transaction Through Negotiations With Abelia**

31. After Tayyare's refusal to go through with the contemplated Second Transaction, ACC was left holding title the Aircraft, with all the attendant liabilities flowing therefrom, and with ACC's agreed upon payments and compensation for its involvement in the transaction unpaid.

32. Having been stymied from conveying the Aircraft to Tayyare, as intended, ACC continued to own and operate the Aircraft.

33. Indeed, from June through August 2024, ACC flew Sharkov around the world on the Aircraft—logging nearly a full year's worth of flight time in just three months. In doing so, Sharkov and Abelia amassed a substantial debt of approximately $1.7 million, incurred for operating expenses ACC paid out of pocket, such as fuel, food, supplies, cleaning, and staff.[4]

34. ACC entered into negotiations with Abelia to inquire about a potential conveyance of the Aircraft to Abelia.

[4] Sharkov additionally owed ACC debt from ACC's operation of another aircraft. Both debts total over $2 million.

35. During these negotiations, ACC insisted on repayment of Abelia's $1.7 million debt—which Mr. Sharkov had incurred through use of the Aircraft—a condition that Abelia refused.

36. ACC also insisted on receiving warranties and know-your-customer information needed for regulatory compliance, and a release by the financier, Domeltino, of any monetary obligation stemming from the purchase of the Aircraft.

37. Abelia did not provide this information or agree to give these warranties. Nor did Domeltino agree to release ACC.

38. On January 14, 2025, ACC sent a letter to Abelia requesting information about Abelia's ultimate beneficial ownership needed to ensure compliance with regulations, including United States and European Union sanctions against Russia.

39. Abelia never responded to that request.

40. Instead, Abelia refused to negotiate and simply demanded that ACC hand over title to the Aircraft without receiving any compensation whatsoever.

41. After ACC refused to transfer title to the Aircraft for nothing, Sharkov concocted a scheme to attempt to force ACC to bend to his will.

**Sharkov's Coordinated Pressure Campaign Against ACC and Buzin**

42. After ACC refused to bend the knee to Sharkov and transfer Aircraft title to Abelia for nothing, Sharkov became enraged and commenced an international pressure campaign to force Buzin and ACC to hand over title to the Aircraft.

43. In furtherance of this scheme, Abelia sent two letters to TVPX falsely stating that ACC had engaged in fraudulent behavior and filed a lawsuit in Florida (where ACC has no contacts).

44. Indeed, Abelia attempted to conceal the lawsuit from ACC by purportedly serving process on one Rosana Andrike in the Mashall Islands, an individual lacking any role with ACC.

45. Thus, ACC had no idea that it had been sued in Florida, and Abelia subsequently obtained a default judgment stating that Abelia was the rightful owner of the Aircraft and directing ACC to transfer all rights of ownership to Abelia.

46. Abelia then took the default judgment to the district court for the central district of Utah, surreptitiously sued TVPX, and convinced that court to grant it a temporary restraining order prohibiting ACC from exercising its ownership rights, the order being based in part on the default judgment Abelia obtained in the Florida case stating Abelia to the legitimate owner of the Aircraft.

47. The Utah action, *Abelia Limited v. TVPX Aircraft Solutions, Inc., As Trustee of TVPX 2024-13461, et. al,* Case No. 2:25-cv-00225-RJS-DAO (District Utah), continues to proceed.

48. The Florida Court ultimately vacated the default and default final judgment on July 26, 2025.

49. However, on or about September 10, 2025, the District Judge dissolved the temporary restraining order.

50. In the meantime, Sharkov escalated his pressure campaign against Plaintiffs.

51. Notably, Sharkov has launched an international smear campaign against Plaintiffs in recent months, loudly (though baselessly) accusing Plaintiffs of fraud and criminal activity.

52. *Inter alia,* Sharkov and his associates have, upon information and belief, caused over sixty-five articles to be published baselessly accusing Plaintiffs of illegal activity; specifically, of concocting a fraudulent scheme to steal the Aircraft from Sharkov, and accusing Plaintiffs of

money laundering, wire fraud, violating court orders, and committing perjury. These articles are attached hereto as Composite Exhibit C.

53. These articles were published, stored, and accessible through servers based in the United States, and were accessible in Utah.

54. A screenshot of the first page of one of the articles is posted below:

Daniel Smith

**A pilot Aleksandr Buzin stole a $20 million airplane and was caught**

July 06, 2025

Given the multi-jurisdictional fraud, false court filings, and wire transfers through U.S. escrow agents, this case goes beyond the civil courts. It is financial fraud, a cross-border crime involving electronic means, and a calculated attempt to use the U.S. business infrastructure to launder stolen goods.

Such behavior warrants the attention of the FBI and International Law Enforcement Agencies that combat money laundering.

Two U.S. courts have already ruled in favor of Abelia Limited, while new lawsuits are pending in Switzerland and the United Kingdom. Abelia Limited has stated its intention to continue fighting until **pilot Aleksandr Buzin** is criminally prosecuted.

55. The above-referenced "article" is representative of the dozens of articles published, capturing their general tone and tenor, and full of (baseless) sensationalist accusations.

56. This article, for example, baselessly accuses Buzin of "financial fraud," of committing a "cross-border crime," of making an attempt to "launder stolen goods," and calls for Buzin to be "criminally prosecuted."

57. Dozens of additional articles make similar salacious allegations, accusing both Buzin and ACC of engaging in fraudulent and criminal conduct in furtherance of their alleged efforts to "steal" the Aircraft.

58. For example, an August 4, 2025 Article entitled *Miami Lawsuit Exposes Aircraft Theft and Multi-Million Dollar Fraud, Demanding Criminal Investigation,* accuses Buzin and ACC of fraud, criminality and "possible money laundering;" an article dated June 24, 2025 with the same title states that the "evidence…points to potential criminal conduct, including fraud, misappropriation of funds, and possible money laundering," while an article dated July 19, 2025 entitled *Contempt of Court: Pilot Buzin Defies the Court by Continuing to Offer the Embraer Legacy 650E Aircraft for Sale*, baselessly accuses Buzin of "egregiously violat[ing] a valid court order and continu[ing] to provide false testimony under oath." *See* Composite Exhibit C.

59. These "articles" make repeated sensational (and false) accusations impugning the character and integrity of Buzin and ACC.

60. Moreover, they do not appear to be genuine articles at all, but paid hit pieces.

61. For example, Dan Agbo, an individual identified as the author of many of the hit pieces, appears to be a freelance writer based in Nigeria available for hire on Upwork.com, and Daniel Smith, another frequently identified "author" of the defamatory articles, appears to be a "marketer," i.e., *not* a legitimate journalist.

62. Indeed, none of the "authors" appear to be legitimate journalists, nor do the articles appear in recognized publications that abide by professional publishing standards.

63. In sum, these pieces are merely paid hit-pieces commissioned by Sharkov and Abelia.

64. These "articles" have caused substantial damages to Plaintiffs.

65. In or about September 2025, ACC was in the process of facilitating the sale of a private business jet, for which it would have received compensation of approximately $1 million. However, ACC's role in the transaction fell through after the other parties discovered Defendants' defamatory articles.

66. Recently, Sharkov has ratcheted up the abuse even further, upon information and belief Sharkov surreptitiously used his influence with Kyrgyz government officials, including in the State Committee for National Security, to secure an arrest warrant against Buzin and Svirin in Kyrgyzstan (where Plaintiffs have no connection) based upon Buzin's alleged plot to defraud Sharkov and steal the Aircraft. This arrest warrant was then transmitted to Interpol, which issued a "Red Notice."

67. The Complaint Sharkov filed with the Kyrgyz State Committee for National Security claiming he is "a victim of the criminal actions of Alexander [sic] Buzin and Konstantin Svirin." The Complaint further claims that Buzin and Svirin through ACC engaged in "forgery of documents and other fraudulent actions [and] took possession of my aircraft worth 20,110,000 US dollars, as well as in cash in the amount of more than 3,000,000 US dollars." *See* Complaint, Ex. D.

68. Similarly, the Red Notice issued against Buzin accuses Buzin of "abusing the trust of the victim Andrey Sharkov, orchestrated a fraud involving the purchase of an Embraer Legacy 650E aircraft worth over $20,000,000. The ownership of the aircraft was registered not to Sharkov's company but to a fictitious firm. Additionally, Buzin, inflated prices for aviation fuel,

causing damages exceeding $3,000,000. As a result, the total damage caused to the victim amounted to over $23,000,000. Afterward, Buzin fled and is currently at large…" *See* Red Notice, Ex. E.

69. Plaintiffs were unaware of the Red Notice's existence until August 6, 2025, when Buzin was arrested on the authority of the Warrant while on a layover in Warsaw, Poland.

70. Buzin had to stay in detention overnight but was allowed to go home

71. Abelia and Sharkov then petitioned to have Buzin extradited to Kyrgyzstan for criminal prosecution.

72. However, on December 16, 2025, a Polish court rejected the request for extradition, finding that Kyrgyzstan's judiciary is notorious for corruption and torture (including coerced confessions), and thus there was a "real risk of violating the fundamental rights" of Buzin.

73. However, while the Polish court denied the extradition of Buzin to Kyrgyzstan, he is currently effectively grounded in Estonia, unable to leave his home country lest another law enforcement agency learns of the Red Notice and reinitiates the prosecution and potential extradition process.

74. Similarly, Svirin is also effectively grounded, unable to leave his residence while the Kyrgyzstan criminal process remains pending.

75. Plaintiffs have uncovered evidence that Sharkov procured the Red Notice through bribery and corruption. In exchange for issuing an arrest warrant and Red Notice against Buzin and Svirin, Sharkov arranged on August 4, 2025—just two days before Buzin was arrested in Warsaw—for several Kyrgyz government officials to fly privately on the Aircraft from Kyrgyzstan to Nice, France.

76. Aboard this August 4, 2025, private flight was Kamchybek Tashiev a politician who is the Chairman of the State Committee for National Security, the agency that issued the arrest warrant against Buzin and Svirin. Also on board was Kamchybek's son.

77. On this date, Sharkov's mega yacht was in the Cannes-Monaco area, where, upon information and belief, several Kyrgyz government officials were treated to a luxurious voyage for helping Sharkov procure the arrest warrant and Red Notice.

78. After treating Kyrgyz officials on his mega yacht, Sharkov arranged for a private return flight from Nice, France to Kyrgyzstan on the Aircraft on August 9, 2025. Aboard this flight were Messrs. Tashiev and Ruslan Kazakbaev, a former Kyrgyz Minister of Foreign Affairs, and Omurbek Babanov, a former prime minister of Kyrgyzstan.

79. As a result, of the warrants and Red Notice, Plaintiffs have been severely negatively impacted.

80. Indeed, Plaintiffs lost one substantial business deal after Buzin was detained in Warsaw and was unable to travel to another country to close a deal due to Sharkov's machinations. The business opportunity would have brought ACC at least $5 million in revenue.

81. Plaintiffs continue to suffer economic damages from further loss of business opportunities stemming from the inability of Buzin and Svirin to travel out of fear of being arrested.

82. Moreover, Buzin has suffered severe emotional distress because of Sharkov's outrageous conduct and from being arrested in Poland and threat of extradition to Kyrgyzstan.

83. Both Buzin and Svirin suffer emotional damages as well from the fear they have of even leaving their homes out of risk of being arrested—all stemming from Sharkov's procurement of the warrants and Red Notice.

84. Moreover, due to Buzin's inability to travel, he has been unable to undertake the training required to maintain his pilot license active. Without his pilot license, Buzin could lose millions in potential future revenue.

85. Plaintiffs bring this action to end Defendants' illegal pressure campaign against them, and to obtain just compensation for the damages caused by the same.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(RICO)**
**(Plaintiffs against Sharkov and Abelia)**

86. Plaintiffs hereby incorporate paragraphs 1 through 85 of the Complaint, as if fully set forth herein.

87. Sharkov (i.e., the culpable person) has intentionally conducted the affairs of Abelia (i.e., the enterprise) in an unlawful manner and through a pattern of racketeering activity, with actual knowledge that the conduct was unlawful.

88. Sharkov caused Abelia to commit at least sixty-five predicate acts of obstruction of justice, in violation of 18 U.S.C. § 1503(a) and 18 U.S.C. § 1512(b)-(d). Sharkov caused Abelia to publish over sixty-five defamatory articles against Plaintiffs with the intent of hindering, delaying, preventing, and dissuading Plaintiffs from further participating in the Utah court proceedings, and from asserting ACC's rights to beneficial ownership of the Aircraft, which is owned by a Utah business trust. These articles used interstate wires because they were stored in and accessible through servers in the United States.

89. Sharkov also caused Abelia to commit the predicate act of obstruction of justice, in violation of 18 U.S.C. § 1503(a) and 18 U.S.C. § 1512(b)-(d) and of money laundering, in violation of 18 U.S.C. § 1956(a)(2)-(3) through the specified unlawful activity of bribery of a public official

and an offense with respect to which the United States would be obligated to extradite Sharkov or submit the case for prosecution if Sharkov were found in the territory of the United States, and through conduct with is a violation of the Foreign Corrupt Practices Act. More specifically, Sharkov caused Abelia to bribe Kyrgyz officials that, in exchange for issuing warrants and Red Notices against Buzin and Svirin, Sharkov arranged for luxurious private flights on the Aircraft (owned by a Utah business trust) for the Kyrgyz officials with, upon information and belief, the expenses of these flights being paid at least in part with US currency and through the use of the US banking system and wires. Sharkov's intent of coordinating this bribery scheme resulting in warrants and Red Notices against ACC's officers was to hinder, delay, prevent, and dissuade Plaintiffs from further participating in the Utah court proceedings, and from asserting ACC's rights to beneficial ownership of the Aircraft, which is owned by a Utah business trust.

90. These predicate acts are related and pose or amount to a threat of continued criminal activity.

91. These predicate acts were done with the intent to unlawfully influence and obstruct the Utah action and Florida action. Sharkov's intent is to hinder, delay, prevent, and dissuade Plaintiffs from further participating in these legal proceedings.

92. Due to Defendants' pattern of racketeering, Plaintiffs have suffered damages and demand treble damages, attorneys' fees, and costs.

**SECOND CAUSE OF ACTION**
**(Defamation)**
**(Plaintiffs against Sharkov and Abelia)**

93. Plaintiffs hereby incorporate paragraphs 1 through 85 of the Complaint, as if fully set forth herein.

94. As more fully discussed herein, Sharkov and Abelia have published numerous statements to third parties alleging that Plaintiffs engaged in fraudulent and illegal conduct in furtherance of an alleged plot to "steal" the Aircraft.

95. These statements were (and are) baseless, and false.

96. These statements were not (and are not) subject to any privilege.

97. Sharkov and Abelia published these statements to third parties despite knowing of their falsehood.

98. Alternatively, Sharkov and Abelia published these statements with a reckless, and/or negligent disregard for the truth of the matter.

99. Sharkov's and Abelia's defamatory statements have damaged Plaintiffs.

100. Moreover, given that Sharkov and Abelia have accused Plaintiffs of fraudulent conduct regarding their business activities—i.e., conduct incompatible with the exercise of a lawful business—Abelia's defamatory statements constitute defamation per se, and damages are presumed.

101. Plaintiffs seek to recover their compensatory damages.

102. Plaintiffs additionally seek punitive damages given that the false statements were published willfully and maliciously with the express intent to harm Plaintiffs.

## THIRD CAUSE OF ACTION
**(Abuse of Process)**
**(Buzin and Svirin against Sharkov)**

103. Buzin and Svirin hereby incorporate paragraphs 1 through 85 of the Complaint, as if fully set forth herein.

104. As more fully discussed herein, upon information and belief, Sharkov exerted pressure on, and/or offered inducements to, Kyrgyz officials to get them to issue a bogus arrest warrants for Buzin and Svirin.

105. In concocting the scheme to have Buzin and Svirin arrested, Sharkov acted with malice, and the ulterior motive of harming the business interests of Buzin, Svirin, and ACC.

106. On August 6, 2025, Buzin was arrested in Warsaw, Poland, based upon the issued warrant.

107. Sharkov has subsequently used Buzin's arrest (on fictitious charges) to wilfully harass Buzin and ACC, bolster Defendants' international smear campaign against them, and to exert pressure on Plaintiffs to settle pending litigation on unfavorable terms.

108. Defendants' abuse of process has caused economic damages to Buzin and Svirin.

109. Buzin has additionally suffered severe emotional damages as a result of his arrest.

110. Buzin and Svirin seeks to recover these damages.

111. Additionally, Buzin and Svirin seeks punitive damages given that Sharkov's actions were undertaken willfully and maliciously for the express purpose of harming Buzin and Svirin and to pressure Plaintiffs to settle ongoing litigation.

**FOURTH CAUSE OF ACTION**
**(Slander of Title)**
**(ACC against Sharkov and Abelia)**

112. ACC hereby incorporates paragraphs 1 through 85 of the Complaint, as if fully set forth herein.

113. As more fully discussed herein, Sharkov and Abelia have caused the publication of numerous articles slandering ACC's equity title in the Aircraft.

114. Specifically, these articles have alleged that ACC acquired equitable title in the Aircraft through criminal, and/or fraudulent means, and that ACC has no legitimate title in the Aircraft, equitable or otherwise (the "**Slanderous Statements**").

115. These Slanderous Statements were (and are) false.

116. Defendants made the Slanderous Statements with malice.

117. The Slanderous Statements caused special damages to ACC.

118. Specifically, as a result of the Slanderous Statements, ACC's equitable title has been questioned, and the value of ACC's equitable title in the Aircraft has been diminished.

119. ACC seeks to recover its special damages on its slander of title claim.

120. Additionally, ACC seeks to recover, as part of its special damages, its reasonable attorneys' fees necessarily expended to remedy the disparagement of ACC's equitable Aircraft title.

**FIFTH CAUSE OF ACTION**
**(Intentional Infliction of Emotional Distress)**
**(Buzin against Sharkov)**

121. Buzin hereby incorporates paragraphs 1 through 85 of the Complaint, as if fully set forth herein.

122. As more fully discussed herein, upon information and belief, Sharkov exerted pressure on, and/or offered inducements to, Kyrgyz officials to get them to issue a bogus arrest warrant for Buzin.

123. Sharkov's above-described conduct was outrageous.

124. Upon information and belief, Sharkov arranged for the bogus arrest of Buzin with the intent of causing Buzin emotional distress, and/or undertook such actions with reckless disregard of the probability of causing emotional distress.

125. As a result of Sharkov procuring the bogus arrest warrant, Buzin was arrested in Warsaw, Poland on August 6, 2025.

126. As a result of his arrest, Buzin suffered severe emotional distress.

127. Sharkov's outrageous conduct manufacturing the arrest of Buzin actually and proximately caused Buzin's severe emotional distress.

128. Buzin seeks to recover damages to compensate for his severe emotional distress.

129. Buzin additionally seeks to recover punitive damages given that Sharkov's actions were undertaken willfully and maliciously for the express purpose of harming Buzin and to pressure Buzin to settle ongoing litigation.

**<u>SIXTH CAUSE OF ACTION</u>**
**(Negligent Infliction of Emotional Distress)**
**(Buzin against Sharkov)**

130. Buzin hereby incorporates paragraphs 1 through 85 of the Complaint, as if fully set forth herein.

131. This cause of action is pled in the alternative.

132. Sharkov, through his interactions with Kyrgyz officials, negligently caused said authorities to issue a bogus arrest warrant for Buzin.

133. Buzin was arrested on the strength of that warrant in Warsaw, Poland, on August 6, 2025.

134. As a result of his arrest, Buzin suffered emotional distress.

135. A reasonable person would have suffered emotional distress under such circumstances.

136. Buzin's emotional distress was accompanied by objective symptomology.

137. Buzin seeks to recover damages for the emotional distress he suffered as a result of Sharkov's negligence.

**SEVENTH CAUSE OF ACTION**
**(False Light)**
**(Plaintiffs against Sharkov and Abelia)**

138. Plaintiffs hereby incorporate paragraphs 1 through 85 of the Complaint, as if fully set forth herein.

139. As more fully discussed herein, Defendants have published numerous statements to third parties and the public (falsely) accusing Plaintiffs of fraudulent, and/or criminal conduct.

140. Indeed, Defendants have broadcast to the public far and wide that Plaintiffs attempted to steal the Aircraft through deceit, fraud, cunning, and/or criminal conduct, (falsely) labelling Plaintiffs as fraudsters and criminals.

141. The false light in which Plaintiffs have been portrayed by Defendants would be highly offensive to a reasonable person.

142. Defendants knew that their portrayal of the Plaintiffs as fraudsters and criminals was false.

143. Alternatively, Defendants recklessly disregarded whether their portrayal of Plaintiffs was false.

144. As a result of being placed in a false light, Plaintiffs have suffered economic damages.

145. Additionally, Buzin and Svirin suffered severe emotional distress as a result of being placed in a false light.

146. Plaintiffs seek to recover these damages.

147. Plaintiffs additionally seek to recover punitive damages given that Defendants' actions were undertaken willfully and maliciously for the express purpose of harming Plaintiffs and to pressure Plaintiffs to settle ongoing litigation.

**EIGHTH CAUSE OF ACTION**
**(Civil Conspiracy)**
**(Plaintiffs against Sharkov and Abelia)**

148. Plaintiffs hereby incorporate paragraphs 1 through 85 of the Complaint, as if fully set forth herein.

149. Upon information and belief, Sharkov, Abelia, the Domeltino Foundation, Denis Korolev, Dan Agbo, Daniel Smith, and certain Kyrgyz officials, among others (the "**Conspirators**") combined, conspired, and jointly worked to institute an international smear and pressure campaign designed to financially harm Plaintiffs, harass and humiliate Plaintiffs, to extort Plaintiffs to settle pending litigation brought by Abelia, and to generally diminish Plaintiffs' goodwill, reputation, and business.

150. Upon information and belief, in furtherance of their campaign against Plaintiffs, the Conspirators agreed to institute an international smear campaign against Plaintiffs by, *inter alia*, arranging for the publication of numerous defamatory articles against Plaintiffs.

151. The Conspirators, upon information and belief, additionally agreed to exert influence over Kyrgyz authorities, to obtain a bogus arrest warrant against Buzin and Svirin.

152. In furtherance of the conspiracy, the Conspirators committed numerous unlawful, overt acts.

153. *Inter alia,* upon information and belief, the Conspirators paid individuals to publish knowingly false articles baselessly accusing Plaintiffs of fraud and criminality, and exerted

pressure on, and/or offered inducements to, Kyrgyz officials to get them to issue a bogus arrest warrant for Buzin and Svirin.

154. Plaintiffs have been damaged as a proximate result of the Conspirators' conduct.

155. ACC has suffered economic damages.

156. Buzin and Svirin have suffered both economic damages and emotional distress damages.

157. Plaintiffs seek to recover said damages.

158. Plaintiffs additionally seek to recover punitive damages given that Defendants' actions were undertaken willfully and maliciously for the express purpose of harming Plaintiffs and to pressure Plaintiff to settle ongoing litigation.

## NINTH CAUSE OF ACTION
**(Intentional Interference with Economic Relations)**
**(Plaintiffs against Sharkov and Abelia)**

159. Plaintiffs hereby incorporate paragraphs 1 through 85 of the Complaint, as if fully set forth herein.

160. Plaintiffs have existing economic and potential relations with numerous companies and individuals, including a client for whom it was brokering the sale of an aircraft and a client whom it would perform aviation management services.

161. Defendants intentionally interfered with Plaintiffs' above-described existing and potential economic relations via improper means.

162. *Inter alia,* upon information and belief, Defendants communicated to Plaintiffs' existing and potential customers identified above the baseless allegations that Plaintiffs "stole" the Aircraft via fraud, and/or criminal conduct.

163. Additionally, upon information and belief, Defendants concocted and executed a plan to obtain a bogus arrest warrant for Buzin an Svirin, have Buzin arrested, and then used the incident to further strain relations between Plaintiffs and Plaintiffs' existing and potential customers identified above.

164. As a result of Defendant's wrongdoing, Plaintiffs have suffered damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court:

A. Find for Plaintiffs on all of Plaintiffs' claims.

B. Award Plaintiffs their compensatory and consequential damages;

C. Award punitive damages as requested herein;

D. Award Plaintiffs their reasonable attorneys' fees and costs;

E. Award Plaintiffs injunctive and equitable relief; and

F. Award Plaintiffs such other relief that this Court determines to be just and warranted.

## JURY DEMAND

Pursuant to FED. R. CIV. P. 38, Plaintiffs demand a jury trial on all issues so triable.

Dated: February 13, 2026.

*/s/ Kade N. Olsen*
Kade N. Olsen