Steven R. Sumsion (#8317)
**SUMSION BUSINESS LAW**
1800 Novell Place, 5th Floor
Provo, UT 84606
Tel: (801) 375-2830
Email: steve@businesslawutah.com
*Attorney for Plaintiff*

---

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| **AVIATION CONSULTING CORPORATION**, a Marshall Islands Company, **ALEKSANDR BUZIN**, an individual, **and KONSTANTIN SVIRIN**, an individual<br><br>Plaintiffs,<br><br>v.<br><br>**ABELIA LIMITED**, a Bermuda Company, and **ANDREY SHARKOV**, an individual,<br><br>Defendants. | **MOTION TO DISMISS**<br><br>Civil No.: 2:26-cv-129<br><br>Magistrate Judge Daphne A. Oberg |

Pursuant to Fed. R. Civ. P. Rules 12 and 7, 28 U.S. Code § 1927, and the local rules of practice, Defendants Abelia Limited ("Abelia") and Andrey Sharkov ("Sharkov," collectively "Defendants"), hereby move this Court to dismiss the Complaint filed on February 13, 2026, *see* [ECF 1] ("Complaint"), with prejudice for vexatious litigation and failure to state a claim.

## INTRODUCTION

The assertion by Plaintiffs that they operate a "legitimate global aviation business with clients around the world" is fabrication. *See* Compl. ¶¶ 8, 19. The reality is far simpler. Abelia was ACC's main sole client, a fact Buzin confirmed to Sharkov in writing. During the inquiry of a

number of companies, it was established that 100% of ACC's revenue consisted of payments from Abelia. Exploiting Andrey Sharkov's demanding schedule and trust, Buzin constructed an elaborate corporate structure around Abelia consisting of 7 entities with similar-sounding names registered across multiple jurisdictions and 20 bank accounts (and this is only what has been discovered to date). This complex network surrounding a single client existed for one purpose: to conceal and support the multi-year theft of millions of dollars (upon information, no taxes were paid on these funds in any jurisdiction).

The Plaintiffs are not "legitimate businessmen aggrieved by a wealthy client.” They are a scamming pilot and his accomplice who systematically embezzled from their sole client until they were caught attempting to steal an aircraft valued at over 20 million dollars. Now they seek refuge in this Court with meritless claims designed to deflect attention from their own criminal conduct and from the litigation in which Abelia seeks recovery of title to the aircraft in this same District, and in which Abelia’s Motion for Partial Summary Judgement is pending. *See Abelia Limited v. TVPX Aircraft Solutions, Inc*., Case No. 2:25-cv-00225-RJS-DAO (D. Utah) (“Ownership Action”). Their version of events is fabricated, their testimonies change with each filing, and the undisputed facts expose them for what they are.

Plaintiff Aleksandr Buzin is a private-aviation pilot who serviced one client, Abelia. For nearly eight years, he operated aircraft owned by Defendant Abelia and its beneficial owner, Andrey Sharkov. Sharkov is a successful international businessman with enterprises in the United States and Europe. This relationship was built on years of collaboration and trust — and nearly eight years of undetected theft bred in Buzin a sense of impunity that emboldened him to attempt to steal an aircraft worth over 20 million dollars.

Throughout the years of service, Buzin operated an intricated embezzlement scheme. He created a sham fuel broker — a shell entity that systematically inflated fuel costs, allowing Buzin to embezzle millions. He issued invoices from entities with similar-sounding names registered across multiple jurisdictions — names deliberately chosen to create confusion. He utilized over a dozen bank accounts to launder the stolen proceeds. All of this to was done in service of his theft of his sole client. Now these fraudulent actions have become obvious, and Sharkov intends to pursue these violations in appropriate jurisdictions.

The opportunity for Buzin's most audacious fraud arose in early 2024. Sharkov was constantly busy developing his American enterprise — a business now employing hundreds — and could not personally oversee this transaction. His prior aircraft purchases were made directly from manufacturers who knew him as a reliable and qualified buyer. This transaction was different: a secondary market seller who did not know the ultimate purchaser. Buzin saw his chance to hit the jackpot.

Abusing Sharkov's trust and taking advantage of his busy schedule, Buzin fraudulently registered the aircraft in ACC's name without paying a cent. Sharkov's funds — over 20 million dollars — financed the aircraft purchase entirely. Sharkov is currently conducting an investigation to determine whether the role of his lawyer Denis Korolev was the result of gross negligence or conspiracy with Buzin to receive part of the illegally obtained funds.

After being exposed, Buzin's scheme transformed from outright theft to extortion — and his version of events changed with each failure. Initially, he claimed the aircraft belonged unconditionally to ACC — Abelia and Sharkov had nothing to do with the deal. When Abelia's evidence undermined this version, Buzin began appealing to unsubstantiated invoices totaling approximately 2 million dollars (some of which were never invoiced to Abelia). When Abelia

demanded proof of expenses and the original documentation required by the operating agreement, Buzin refused. When this extortion tactic also failed, a new version emerged: he was now allegedly "owed a commission." In the latest iteration, Buzin claims the right to sell the aircraft — for which he paid nothing — to Abelia and Sharkov, whose funds were used to purchase it. In all versions, the required amount fluctuates around 2 million dollars. Buzin's narrative changes, but the extortion remains constant.

Now, Buzin admits he was merely a "temporary holder" who is owed an absurd and unsubstantiated commission unprecedented in the aviation industry (it should be noted, the purchase scheme making ACC a "temporary holder" of a more than 20 million aircraft it did not pay for went against Sharkov's instructions). This theory did not exist at the outset—it was fabricated after litigation commenced to justify his retention of stolen property. He admits his temporary status yet refuses to transfer ownership, deploying every conceivable tactic to hold an asset worth over 20 million dollars hostage.

When Abelia sent written notice to both Buzin and Svirin warning of legal consequences on January 7, 2025, the Plaintiff Konstantin Svirin — Buzin's accomplice who served as the nominal owner of the sham fuel broker Jet A UK LP (this is the firm that was used to embezzle millions in fuel overcharges over its eight years of "service" to Abelia) since 2021 — suddenly no longer wished to hold that position. And on January 15, 2025 (a week after receiving the threat of prosecution), he urgently left the company, transferring it to its true owner, Buzin. Notably, the Plaintiffs' Complaint fails to establish any material connection between the underlying dispute and Svirin. As such, Svirin lacks standing entirely to bring this Complaint before this Court.

ACC, Buzin, and Svirin are not victims. They are a scammers and accomplices who, having been exposed, now attempt to weaponize this Court against the client they deliberately defrauded for nearly a decade.

Now, with Abelia's Motion for Partial Summary Judgment pending in the Ownership Action—and with the Court already having found a substantial likelihood of success on the merits sufficient to warrant a Temporary Restraining Order—Plaintiffs have filed this nine-count Complaint. The timing is not coincidental. Facing the imminent prospect of an adverse ruling that will confirm what Plaintiffs themselves have admitted—that Domeltino Foundation funded the entire Aircraft purchase and that Tayyare Limited (Sharkov's entity), not ACC, was the intended final owner—Plaintiffs have manufactured a new lawsuit to delay, distract, and multiply litigation costs.

This Motion demonstrates why each of their claims must be dismissed with prejudice and an award of attorney fees be granted under 28 U.S. Code § 1927.

## I. THE OWNERSHIP ACTION AND PLAINTIFFS' OWN ADMISSIONS DOOM THIS COMPLAINT

The essential facts of the dispute over the ownership of the Aircraft are not genuinely contested. On March 21, 2025, Abelia filed the Ownership Action, Abelia Limited v. TVPX Aircraft Solutions, Inc., Case No. 2:25-cv-00225-RJS-DAO (D. Utah), seeking declaratory relief and quiet title to the Embraer Legacy 650E aircraft (the "Aircraft"). The Honorable Court granted a Temporary Restraining Order, necessarily finding a "substantial likelihood of success [of Abelia] on the merits." because "in can be reasonably assumed that any sale of the Aircraft by Aviation Consulting would likely be fraudulent." *See*, Order Granting Motion for Temporary Restraining Order, Dkt. 7, Case No. 2:25-cv-00225. As of October 20, 2025 the Court issued the

Order Approving Stipulation, whereby, the Title to the Aircraft was deposited with the Court. *Id.* At Dkt. 94. This order is still in effect. Abelia's Motion for Partial Summary Judgment for quiet title is now pending in that action.

Plaintiffs' own Complaint in this action contains the admissions that seal their fate. Plaintiffs admit: Domeltino Foundation—not ACC—provided the financing for the Aircraft purchase (Compl. ¶ 24) and ACC found itself stuck "holding title" only because of their improper actions. In short, ACC paid nothing for the Aircraft, was never intended to be the permanent owner, and is holding a $20 million asset hostage to extract approximately $2 million in disputed fees it cannot substantiate.

Domeltino confirmed that the funds used to purchase the aircraft belonged to Sharkov and that he and his legal entity was the intended end beneficiary of the aircraft. At no point did any party involved in the transaction intended for Buzin and/or ACC to have ownership. <u>The question that lingers is simple: if ACC is indeed an innocent operator that incidentally got stuck with the more than 20 million dollars asset and just wants to give it back to the rightful owner – why did they bring an action before this Honorable Court fighting over ownership, when ACC can just act in accordance with its own letter of January 2025 to Abelia and sign over the Aircraft and deal with its alleged bills separately. Instead, the Plaintiffs in this action are simply talking out of two sides of their mouth and want to extend their improper ownership as long as possible to use the aircraft as an extortion vehicle to force Abelia to negotiate unsubstantiated bills.</u>

On June 13, 2025—eight months before filing this Complaint—ACC filed a comprehensive Crossclaim in the Ownership Action asserting seven causes of action: (1) declaratory judgment; (2) breach of contract; (3) promissory estoppel; (4) unjust enrichment; (5) defamation; (6) tortious interference; and (7) abuse of process. Every cause of action in this

Complaint is rooted in the identical operative facts. This Complaint is not a legitimate legal filing. It is a dilatory and utterly vexatious tactic, filed as the Ownership Action approaches its conclusion, designed to muddy the waters and delay the inevitable.

## II. THE COURT LACKS PERSONAL JURISDICTION OVER DEFENDANTS

Plaintiffs bear the burden of establishing personal jurisdiction over each Defendant. *Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011). Sharkov does not have U.S. citizenship. He maintains no office, residence, bank account, employees, or business in Utah. Abelia is a Bermuda company with the registered address Hamilton, Bermuda.

Plaintiffs invoke Utah's Long-Arm Statute on the theory that "defamatory articles were accessible to Utah residents." Compl. ¶¶ 15–16. This is manifestly insufficient. Mere internet accessibility does not establish personal jurisdiction. *Shrader*, 633 F.3d at 1240–41. The Tenth Circuit's purposeful availment analysis under *Calder v. Jones*, 465 U.S. 783 (1984), requires: (1) an intentional action; (2) expressly aimed at the forum state; and (3) knowledge that the injury would be felt in the forum state. *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1072 (10th Cir. 2008). The articles did not target Utah. The alleged defamatory articles were published globally on the internet, accessible worldwide, and even the articles themselves do not reference the Defendant as the source, rather they reference public records and sources.

As the Courts reputedly noted, accessibility to Utah residents does not establish that any defendant targeted Utah. Moreover, as the Supreme Court has held, "[t]he plaintiff cannot be the only link between the defendant and the forum." *Walden v. Fiore*, 571 U.S. 277, 285 (2014). The only Utah nexus—a business trust holding aircraft title—is the subject of the Ownership Action, not a basis for tort jurisdiction. The Court must dismiss for lack of personal jurisdiction. It is

worth mentioning that as of October, 2025 the Utah Trust transferred title to this Honorable Court, until the resolution of the dispute of ownership.

## III. VENUE IS IMPROPER AS TO ALL TORT CLAIMS

Under 28 U.S.C. § 1391(b), venue is proper only where a defendant resides or where a substantial part of the events giving rise to the claim occurred. No party in this action resides in Utah. The alleged defamatory articles were published on the internet globally. The criminal complaint was filed in Kyrgyzstan, where Sharkov is a citizen and where just some of Buzin's crimes occurred. The arrest occurred in Warsaw, Poland. The Interpol Red Notice was issued in Lyon, France. The alleged improper acts occurred in or around Kyrgyzstan and the south of France. Not one of these events occurred in Utah. The existence of a related case in this District does not establish venue for an independently filed tort action. *See*, *Atl. Marine Constr. Co. v. U.S. Dist. Ct.*, 571 U.S. 49, 59 (2013). As such, these claims must be dismissed.

Plaintiffs' theory that the Interpol Red Notice was issued unlawfully is not merely unsubstantiated — it is structurally impossible under the very international legal framework Plaintiffs invoke. A Red Notice is not a favor dispensed by a single official. Before any Red Notice is published, INTERPOL's General Secretariat in Lyon — through its dedicated Notices and Diffusions Task Force and Office of Legal Affairs — independently verifies compliance with the INTERPOL Constitution, including respect for the Universal Declaration of Human Rights (Article 2), strict prohibition on politically motivated notices (Article 3), data sufficiency, minimum offense seriousness, and a full human rights review for risk of discriminatory prosecution. The request must be supported by a valid arrest warrant or judgment issued by a competent judicial authority, and it must pass review by INTERPOL's 195-member-state network before publication. Plaintiffs' improper warrant Interpol theory therefore requires this Court to

accept an unsubstantiated, and, frankly, unprovable theory that one individual can simultaneously manipulate (1) the relevant local and international criminal systems, including a national investigative agency who opened the case, (2) the national prosecutors who reviewed it, (3) the national justice system that issued the arrest warrant, and then separately (4) the independent review mechanisms of, Interpol, whose entire institutional function is to screen out exactly the kind of abuse Plaintiffs claim occurred. The Supreme Court was clear in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 553-563 (2007) ("Twombly") that a claim requires a complaint with enough factual matter to suggest that an agreement was made. An allegation of parallel conduct and a bare assertion of conspiracy will not suffice." This was reinforced in *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) that a complaint does not suffice if "it tenders naked assertions devoid of further factual enhancement" (internal marks omitted). The instant Complaint is nothing more than a bare assertion of a conspiracy narrative built on inference stacked upon inference, precisely the speculative pleading that *Iqbal* and *Twombly* were designed to eliminate.

Critically, the Polish court's denial of extradition does not vindicate Plaintiffs' narrative in any respect and the extradition request was rejected on the procedural ground that Poland has no extradition treaty with the Kyrgyz Republic and that EU protective policy shields EU citizens from extradition to jurisdictions assessed to present structural rule-of-law concerns — a categorical policy determination that applies irrespective of the merits of any individual case. Compl. ¶ 72. The Red Notice itself remains active and operative. Buzin is free to challenge the charges through proper legal channels in Kyrgyzstan, and contest the Red Notice before INTERPOL's Commission for the Control of INTERPOL's Files — the international body established for precisely that purpose. He has chosen not to do so. Instead, Plaintiffs seek to use this Court — a federal court in Utah with no connection to the Kyrgyz criminal proceedings — as

a collateral forum to delegitimize a validly issued arrest warrant and obstruct a foreign criminal prosecution. That is not a cognizable legal claim before this Court; it is an attempt to weaponize American civil litigation to impede a legitimate sovereign law enforcement process that Buzin should confront directly if he believes himself innocent.

## IV. THIS COMPLAINT IS BARRED BY THE COMPULSORY COUNTERCLAIM DOCTRINE AND THE FIRST-FILED RULE

### *A. The Claims Are Compulsory Counterclaims That Were Waived*

Fed. R. Civ. P. 13(a) requires a party to assert as a counterclaim any claim "arising out of the transaction or occurrence that is the subject matter of the opposing party's claim." Failure to do so results in waiver. *Baker v. Gold Seal Liquors, Inc.*, 417 U.S. 467, 469 n.1 (1974). The Tenth Circuit applies a "logical relationship" test: claims are compulsory if they "share an aggregate of operative facts." *Pipeliners Local Union No. 798 v. Ellerd*, 503 F.2d 1193, 1198 (10th Cir. 1974).

Every cause of action in this nine-count Complaint—RICO, defamation, abuse of process, slander of title, emotional distress, false light, civil conspiracy, and intentional interference—arises from the identical nucleus of operative facts as the Ownership Action: the Aircraft acquisition, the parties' competing ownership claims, alleged overcharges, and subsequent litigation conduct. ACC filed its Crossclaim in the Ownership Action on June 13, 2025. The Complaint's own allegations establish that virtually all allegedly wrongful conduct occurred before that date. These claims were compulsory counterclaims that must have been raised in the Ownership Action. Their omission is a waiver. These claims must be dismissed with prejudice.

### *B. The First-Filed Rule Independently Requires Dismissal*

The first-filed rule provides that when two cases involve the same parties and issues, the second-filed case should be dismissed in favor of the first-filed action. *Hospah Coal Co. v. Chaco*

*Energy Co*., 673 F.2d 1161, 1163 (10th Cir. 1982). The first-filed rule applies equally where the later case is filed in the same district. The Ownership Action was filed March 21, 2025—nearly eleven months before this Complaint. It involves the same parties, the same Aircraft, the same acquisition, the same fuel overcharge allegations, and the same alleged misconduct. ACC's Crossclaim in the Ownership Action already asserts defamation, abuse of process, and tortious interference—the very claims repackaged here. Plaintiffs cannot evade the first-filed rule by adding Buzin and Svirin as individual plaintiffs and layering on additional legal theories. The core dispute is identical. This Complaint must be dismissed.

## V. THE RICO CLAIM IS FRIVOLOUS, LEGALLY DEFECTIVE, AND A TRANSPARENT DILATORY TACTIC

The RICO claim is the centerpiece of Plaintiffs' delay strategy. With Abelia's Motion for Partial Summary Judgment pending in the Ownership Action—and with Plaintiffs' own admissions establishing that ACC never paid for the Aircraft and was never the intended permanent owner—Plaintiffs have manufactured a RICO claim to reframe a straightforward commercial dispute as organized crime and to gain tactical leverage before an adverse ruling issues. This Court should see this gambit for what it is. As the Seventh Circuit observed, "RICO has not federalized every state common-law cause of action available to remedy business deals gone sour." *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992).

The RICO claim fails for at least five independent and fatal reasons.

### *A. Plaintiffs Fail to Allege a Cognizable Enterprise Distinct from the Person*

To state a civil RICO claim under 18 U.S.C. § 1962(c), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *See*, *United States v.*

*Turkette*, 452 U.S. 576, 583 (1981). The enterprise must be an entity "separate and apart from the pattern of activity in which it engages." *Id.* at ¶ 583. Critically, the "person" alleged to have conducted the enterprise's affairs must be distinct from the enterprise itself. *See*, *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).

Plaintiffs allege that Sharkov (the "person") conducted Abelia's affairs (the "enterprise"). Compl. ¶ 87. But Plaintiffs simultaneously allege that Sharkov "is the principal and owner of Abelia." Compl. ¶ 13. The Complaint alleges no Abelia activity apart from being the vehicle through which Sharkov purportedly acted. A corporate owner who conducts his corporation's affairs is not "distinct" from that corporation for RICO purposes. This circular allegation fails the distinctness requirement as a matter of law. *Id.*; *See also*, *Brannon v. Boatmen's First Nat'l Bank of Okla*., 153 F.3d 1144, 1148 (10th Cir. 1998). The RICO claim must be dismissed on this ground alone.

***B. Plaintiffs Fail to Allege Cognizable Predicate Acts***

Plaintiffs allege two categories of predicate acts: (1) obstruction of justice (18 U.S.C. §§ 1503(a), 1512(b)–(d)) based on publication of internet articles; and (2) money laundering (18 U.S.C. § 1956(a)(2)–(3)) based on allegedly arranging private flights. Compl. ¶¶ 88–89. Neither survives scrutiny.

On obstruction: Section 1503(a) requires a pending federal judicial proceeding and the defendant's specific intent to obstruct it. *United States v. Aguilar*, 515 U.S. 593, 599 (1995). The fact of the publication of articles on the Internet about a civil dispute—even critical or false ones—is not obstruction of justice under any recognized legal theory. There is no allegation that Defendants tampered with witnesses, destroyed evidence, bribed a juror, or interfered with any

Court process. Criticism of an opposing party in litigation, however harsh, is not a federal crime. Section 1512 applies to witness tampering and official proceeding obstruction. Plaintiffs identify no single instance of a witness being intimidated or dissuaded from testifying. Publishing articles is not obstruction.

On money laundering: Section 1956(a)(2) prohibits transporting funds internationally to promote specified unlawful activity. Plaintiffs allege "upon information and belief" that the Defendant allegedly arranged trips for officials, with costs paid "at least in part with US currency." Compl. ¶ 89. This is pure speculation without a single concrete allegation—no identified payment, no bank, no date, no amount, no recipient. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Moreover, as the Plaintiffs themselves indicate, the alleged flights were carried out between Kyrgyzstan and France, not the United States. The mere speculation that some costs may have been paid in U.S. currency does not transform a foreign transaction into a domestic RICO predicate.

Rule 9(b) separately requires that allegations of fraud be pled "with particularity." The Tenth Circuit mandates that a plaintiff "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000). The Complaint satisfies none of these requirements. The alleged bribery is a naked assertion. The alleged "paid hit pieces" are attributed only to "upon information and belief" without identifying who paid whom, when, or how much. These allegations fail Rule 9(b) and must be dismissed.

***C. Plaintiffs Fail to Allege a Pattern of Racketeering Activity***

A "pattern of racketeering activity" requires at least two predicate acts that are "related, and that they amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 239 (1989). The alleged predicate acts here—publishing internet articles and allegedly arranging private flights for government officials—do not constitute a pattern of racketeering. There is no cognizable connection between the two alleged categories of conduct. At best, there is a business dispute dressed in organized crime language. That is not a RICO pattern.

***D. Plaintiffs Fail to Allege a Domestic Injury***

The Supreme Court held in *RJR Nabisco, Inc. v. European Cmty*., 579 U.S. 325, 346 (2016), that "a private RICO plaintiff . . . must allege and prove a domestic injury to business or property." This requirement is absolute. ACC is an allegedly Belize redomiciled Marshall Islands company with, according to Buzin, its principal office in Estonia. Buzin resides in Estonia. Svirin resides in Spain. The alleged defamatory articles were published on the internet globally. The alleged but unsubstantiated unlawful acts occurred in Kyrgyzstan. The arrest occurred in Warsaw, Poland. There is no domestic injury. The Aircraft's title being held in a Utah trust does not constitute a domestic injury to Plaintiffs' business or property—particularly when Plaintiffs paid nothing for the Aircraft and are holding it as leverage.

Moreover, the causal chain Plaintiffs allege—from articles published on the internet, to third parties reading those articles, to those third parties deciding not to do business with Plaintiffs—is precisely the attenuated, indirect chain that fails RICO's proximate causation requirement. *Holmes v. Sec. Investor Prot. Corp*., 503 U.S. 258, 268 (1992) (requiring "a direct relation between the injury asserted and the injurious conduct alleged").

***E. The RICO Claim Is a Transparent Attempt to Relitigate the Ownership Action***

The RICO claim is a second bite at the apple. In the Ownership Action, Abelia's Motion for Partial Summary Judgment is pending. Plaintiffs have conceded the core facts: Domeltino Foundation funded the purchase; Sharkov (his legal entity) was the intended final owner; ACC paid nothing.

Rather than defend the Ownership Action on the merits, Plaintiffs have filed this Complaint to: (a) re-characterize an impending adverse ownership ruling as "RICO predicate acts"; (b) leverage the treble damages threat of 18 U.S.C. § 1964(c) to extract a settlement; and (c) complicate this Court's adjudication of the Ownership Action by injecting sensationalist racketeering allegations into the record. The Court should reject this strategy with the unambiguous dismissal it warrants. *See*, *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 655 (S.D.N.Y. 1996) ("RICO has become the litigation equivalent of a thermonuclear device.") (quoting Miranda v. Ponce Fed. Bank, 948 F.2d 41, 44 (1st Cir. 1991)).

## VI. EACH REMAINING CLAIM INDEPENDENTLY FAILS TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

Even if jurisdiction and venue were proper—they are not—each remaining cause of action fails on its face to establish any kind of claim for relief.

***A. Defamation (Count II): Statements Are Substantially True, Privileged, and Not Properly Attributed***

Under Utah law, defamation requires: (1) the defendant published statements; (2) the statements were false; (3) no privilege applies; (4) requisite fault; and (5) damage. *O'Connor v. Burningham*, 2007 UT 58, ¶ 13, 165 P.3d 1214.

First, publication: Plaintiffs have not established that Defendants wrote, edited, approved, or commissioned the alleged articles. The Complaint identifies the authors as "Dan Agbo" and "Daniel Smith," described as a freelance writer and marketer, respectively. Compl. ¶¶ 61–62. The allegation that Defendants "caused" publication is entirely speculative and premised on "upon information and belief" without a single concrete factual allegation. *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (such pleading is insufficient as a substitute for specific factual allegations).

Second, truth: The articles' substance tracks the allegations Abelia has asserted in multiple courts—that ACC acquired title without authorization, that Buzin directed Abelia's own counsel to structure the transaction to benefit ACC, and that ACC has refused to transfer the Aircraft. Truth is an absolute defense. *West v. Thomson Newspapers*, 872 P.2d 999, 1008 (Utah 1994). Whether Abelia's ownership claims will ultimately be proven is the subject of the Ownership Action—not this lawsuit.

Third, special damages: Plaintiffs allege only a single $1 million brokerage deal and a $5 million business opportunity. Compl. ¶¶ 65, 80. They identify no deal parties, no specific articles that caused the failure, no causal nexus. Without particularized special damages allegations, the defamation claim fails. *See, e.g.*, *Wayment v. Clear Channel Broad., Inc.,* 2005 UT 25, ¶ 28, 116 P.3d 271. ACC had "only expenses, no income" by Buzin's own account—making claims of millions in lost deals doubly implausible.

***B. Abuse of Process (Count III): Private Citizens Do Not Control Criminal Prosecutions***

Utah's abuse of process requires: (1) an ulterior purpose; and (2) an act in the use of process not proper in the regular prosecution of the proceeding. *Hatch v. Davis*, 2004 UT App

378, ¶ 27, 102 P.3d 774. This claim rests on the extraordinary theory that Defendant "procured" an Interpol Red Notice—through alleged illegal actions.

A claim for abuse of process is legally impossible. In the Kyrgyz Republic, as in all civil law jurisdictions, criminal proceedings are initiated by investigative bodies and prosecutors, not private complainants. Filing a criminal complaint is the exercise of a constitutional right, not "use of process." An Interpol Red Notice involves at least four layers of independent governmental and intergovernmental review, including compliance with the INTERPOL Constitution's human rights and political neutrality requirements. The suggestion that a private citizen corrupted an entire chain of independent sovereign authorities and then additionally manipulated the review processes of an international organization with 195 member states is—to borrow the Supreme Court's phrase—"not plausible." *Iqbal*, 556 U.S. at 681.

Furthermore, the Polish court's release of Buzin was based solely on the absence of a Poland-Kyrgyzstan extradition treaty and EU citizen protective policy—not on any finding that charges were unfounded. Compl. ¶ 72. The Red Notice remains active. And adjudicating this claim would require this Court to pass judgment on the validity of official acts of the Kyrgyz Republic and Interpol—precisely the inquiry barred by the act of state doctrine. *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897). The claim must be dismissed.

***C. Slander of Title (Count IV): Litigation Positions Are Absolutely Privileged***

Slander of title requires: (1) a false published statement; (2) disparaging plaintiff's title; (3) malice; and (4) special damages. *Bass v. Planned Mgmt. Servs., Inc.*, 761 P.2d 566, 568 (Utah 1988). The alleged "slanderous statements" are that ACC acquired aircraft title through fraudulent means and has no legitimate title. Compl. ¶ 114. These are the legal positions the Court has

considered in granting the TRO. There is no "malice" where Abelia has a bona fide ownership claim supported by undisputed funding records. Moreover, the Temporary Restraining Order—not any article—is the proximate cause of any inability to sell the Aircraft.

***D. Intentional and Negligent Infliction of Emotional Distress (Counts V and VI): Filing a Criminal Complaint Is Not Outrageous Conduct***

The IIED "outrageousness" element sets an extremely high bar. Conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." *Retherford v. AT&T Commc'ns of the Mountain States, Inc.*, 844 P.2d 949, 977 (Utah 1992). Filing a criminal complaint with law enforcement in one's home country—subsequently independently investigated by prosecutors, reviewed by a judge, and validated by Interpol through its independent review process—does not approach this threshold. A citizen's report to law enforcement is a protected right, not outrageous conduct.

The NIED claim (Count VI) fails independently because Plaintiffs plead no objective symptomology—no medical evidence, no diagnosis, no treatment, no physical manifestation. *Hansen v. Mountain Fuel Supply Co*., 858 P.2d 970, 975 (Utah 1993). The bare assertion of "severe emotional distress" is insufficient. Additionally, the intervening independent actions of Polish law enforcement and multiple sovereign authorities break any causal chain between Sharkov's criminal complaint and Buzin's arrest. *Price v. United States,* 174 U.S. 373, 375–76 (1899). Such desperate attempts to improperly invoke IIED and NIED further speak to the fact that this Complaint is nothing more than a vapid litigation tactic, not a sincere pleading. As such, this Complaint ought to be dismissed with prejudice.

***E. False Light (Count VII): Duplicative and Privileged***

A false light claim requires: (1) the defendant publicized matter placing plaintiff in a false light; (2) highly offensive to a reasonable person; and (3) actual malice. *Jensen v. Sawyers*, 2005 UT 81, 130 P.3d 325. This claim is duplicative of defamation and fails for identical reasons. The allegedly "false" portrayal—that Plaintiffs attempted to acquire the Aircraft through deception—is the very claim Abelia is pursuing in the Ownership Action. It cannot simultaneously be a bona fide legal claim and a tortious act. Dismissal as duplicative is appropriate.

***F. Civil Conspiracy (Count VIII): No Pleading Has Been Made***

The Plaintiffs have failed to plead any sort of evidence which would constitute a civil conspiracy. Even if their Complaint is taken as entirely truthful, the Plaintiffs have failed to meet the necessary bar to plead civil conspiracy. " As the Utah Court of Appeals held, "Plaintiff has the burden of presenting clear and convincing evidence supporting [the] conspiracy theory…such evidence is sufficient if it shows that the circumstances are consistent *only* with the existence of a conspiracy. Evidence is insufficient if it discloses acts just as consistent with a lawful purpose as with an unlawful one." *Israel Pagan Estate v. Cannon*, 746 P.2d 785, 790 (Utah App. 1987). The Plaintiffs have not even attempted to argue that its supposed claims could *only* serve the purpose of civil conspiracy. Moreover, the alleged "conspirators" include Domeltino Foundation, Denis Korolev, Dan Agbo, Daniel Smith, and unnamed Kyrgyz and Interpol officials—none of whom are parties to this action. Compl. ¶ 149. More likely, we believe that Denis Korolev is Buzin's accomplice, since, being Sharkov's lawyer, it was with his participation that this fraud became possible, and in this Complaint, he is mentioned only to distract attention. The allegation that government officials are co-conspirators in a scheme to defame an Estonian pilot is extraordinary, unsupported, and borders on the sanctionable.

### *G. Intentional Interference with Economic Relations (Count IX): Vague, Duplicative, and Premised on Protected Speech*

Intentional interference requires: (1) intentional interference with existing or potential economic relations; (2) by improper means; (3) causing injury. *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 304 (Utah 1982). Plaintiffs identify only "a client for whom it was brokering the sale of an aircraft" and "a client whom it would perform aviation management services." Compl. ¶ 160. No names. No contract terms. No specifics. See *Eldridge v. Johndrow*, 2015 UT 21, ¶ 44, 345 P.3d 553. The alleged "improper means" consists of the same publications forming the defamation claim. Protected speech cannot constitute improper means. Leigh Furniture, 657 P.2d at 308. The claim is both legally deficient and duplicative.

## VII. THE NOERR-PENNINGTON DOCTRINE AND FIRST AMENDMENT INDEPENDENTLY BAR THE TORT CLAIMS

Multiple claims are premised on Defendants' litigation activity across multiple jurisdictions. The *Noerr-Pennington* doctrine provides that those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct. *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961). This doctrine extends to tort claims, including abuse of process. *See*, *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929–30 (9th Cir. 2006).

The sham exception requires showing that the underlying lawsuit was "objectively baseless" and motivated by intent to interfere with business. *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60-61 (1993) ("PRE"). Abelia's Ownership Action is plainly not sham litigation. This Court granted a Temporary Restraining Order—necessarily finding a substantial likelihood of success on the merits. A litigant whose claims are

meritorious enough to warrant injunctive relief cannot, by definition, be engaged in sham litigation. Similarly, the criminal complaint filed in Kyrgyzstan—which resulted in an investigation, prosecution, and internationally validated arrest warrant—is petition activity directed at government officials, precisely the conduct protected by the First Amendment's Petition Clause.

## VIII. THIS COMPLAINT WARRANTS SANCTIONS UNDER RULE 11 AND 28 U.S.C. § 1927

Fed. R. Civ. P. 11 requires that every pleading be filed for a "proper purpose" and that the legal contentions therein are "warranted by existing law or by a nonfrivolous argument." Fed. R. Civ. P. 11(b)(1)–(2). This Complaint was filed for an improper purpose. Plaintiffs already have a pending action in this District in which they have asserted seven causes of action. Rather than amend their Crossclaim in the Ownership Action—the proper procedural vehicle—Plaintiffs filed an entirely separate lawsuit to multiply litigation costs, burden Defendants, and gain tactical leverage as the Ownership Action approaches summary judgment.

The RICO claim, in particular, is frivolous. It fails to allege a cognizable enterprise, predicate acts pled with particularity, a pattern of racketeering, or a domestic injury. The bribery and money laundering allegations are entirely speculative. The claim's sole purpose is to attempt to invoke the treble damages provision of 18 U.S.C. § 1964(c) and attempt to label Defendants as "racketeers." Courts have repeatedly condemned this tactic. *See*, *Katzman*, 167 F.R.D. at 655. Defendants reserve their right to move for sanctions under Rule 11 and 28 U.S.C. § 1927 after the safe harbor period expires if the Complaint is not voluntarily withdrawn. Defendants request that the Court award attorneys' fees and costs pursuant to 28 U.S.C. § 1927 and the Court's inherent authority.

## IX. CONCLUSION

This Complaint is not the product of genuine grievance. It is a litigation weapon. Plaintiffs paid nothing for the Aircraft. Their own filing concedes that Domeltino Foundation funded the purchase using Sharkov's funds and that Sharov via one of his legal entities was supposed to become the actual owner. Having been exposed, they now attempt to weaponize this Court.

Defendants Abelia Limited and Andrey Sharkov respectfully request that this Court:

1. Dismiss the Complaint in its entirety with prejudice pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(2), 12(b)(3), and 12(b)(6);

2. Award Defendants their reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1927 and the Court's inherent authority; and

4. Grant such other and further relief as this Court deems just and proper.

DATED: March 9, 2026.

**SUMSION BUSINESS LAW**
*/s/ Steven R. Sumsion*
Steven R. Sumsion
*Attorney for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 9, 2026, I caused a true and correct copy of the foregoing **MOTION TO DISMISS** to be served upon or delivered to all parties who have appeared in this case via the Court's electronic filing system.

**SUMSION BUSINESS LAW**
*/s/ Mark Norton*
Mark Norton
*Paralegal*